[Civil No. 737.    Filed June 1, 1901.]

[65 Pac. 332.]

## HENRY E. SLOSSER, Plaintiff and Appellant, v. SALT RIVER VALLEY CANAL COMPANY, a Corporation, Defendant and Appellee.

1. WATER AND WATER-RIGHTS — APPROPRIATION—STATUTES—CONSTRUCTION—FOREIGN DECISIONS.—The legislation of the territory of Arizona differs fundamentally upon the subject of appropriations of water for beneficial uses from the legislation of other states and territories, with the single exception of the territory of New Mexico, and, therefore, the decisions of other states are not controlling ·in the decision of questions which arise under local laws.

2. SAME — SAME — CORPORATION—RIGHT TO APPROPRIATE—COMP. LAWS. ARIZ. 1871, CHAP. 55, SECS. 3, 7, (REV. STATS. ARIZ. 1901, PARS. 4176, 4180,) CONSTRUED.—A corporation is included among persons authorized to construct acequias and make an appropriation of water for agricultural purposes.

3. SAME—SAME—BASIS OF RIGHT—COMP. LAWS ARIZ. 1871, CHAP. 55, SECS. 1, 3, 7, (REV. STATS. ARIZ. 1901, PARS. 4174, 4176, 4180,) CONSTRUED.—Under the statutes, *supra,* the ownership and possession of arable and irrigable land is essential for the acquisition of the right of appropriation of water from a public stream for purposes of irrigation.

4. SAME—CORPORATIONS—APPROPRIATION.—A corporation organized for the purpose of diverting and delivering water from a public stream to water-users and not itself the owner or possessor of arable or irrigable land is not an appropriator of water.

5. SAME—APPROPRIATION—DEFINITION.—The definition of an appropriation involves the idea of the use or application of water from a public stream for a beneficial purpose, under conditions prescribed by statute, or by custom having the effect of law, so as to vest a permanent right to such use and application, and necessarily involves an equally fixed or permanent ownership or control of the means by which the use and application may be enjoyed.

6. SAME—SAME—DIVERSION—OWNERSHIP.—Means of diversion may be owned in common by a number of appropriators, or such means may be owned by one person and the appropriation by another, provided the latter has a fixed or permanent right, by contract or otherwise, entitling him to the service of such means for the purpose of his appropriation.

7. SAME—SAME—HOW PERFECTED.—An appropriator may immediately, by constructing and owning his own ditch or canal, or, mediately,

by acquiring the permanent right to the service of another's ditch or canal, whether the latter be owned by a natural or artificial person, perfect his appropriation.

8. Same — Same—Diversion—By Corporation—Agency.—A corporation organized for the purpose of furnishing water for agricultural purposes, to be used by others in privity of contract with it, becomes the mere agent of the latter, and may divert from a public stream water which the latter may acquire and use for purposes of irrigation, and the measure of its right to divert is the needs and requirements of those owners or possessors of arable and irrigable lands with whom, by contract, it stands in relation as agent.

9. Same—Public Property.—Water, being public property in a running stream, continues to be public property even when diverted for beneficial uses, and remains such until actually applied to such uses.

10. Same—Appropriation—Control of.—Whenever an appropriator of water ceases to use for a beneficial purpose any water which has its source in a public stream, his power or authority to control the same ceases.

11. Same—Canal Companies—Shares.—Where a corporation and its shareholders have regarded each share as carrying with it a water-right in the canal, as between the corporation and its members and between the shareholders themselves, the ownership of such shares of stock may establish all the rights to the use of water which would follow were the owners of such shares tenants in common in the canal, provided each stockholder claiming said right has made an actual application of it to a beneficial use.

12. Same—Water-Rights—Must Be Attached to Land.—A water-right, to be effective, must be attached to land, and become, in a sense, appurtenant thereto.

13. Same—Canal Companies—Shares—Service to Non-Shareholders on Order of Shareholders.—Shareholders, as such, in a corporation not the appropriator of water possess no rights as appropriators of water, and the practice of the corporation of recognizing shares of stock as "floating water-rights" and "selling water" for irrigating seasons to persons who are not water-right holders in the company upon the orders of shareholders, is the same in effect as though it supplied such users with water without the consent of such shareholders.

14. Same—Diversion—Change in Means of—Abandonment.—Where it appears that plaintiff appropriated water through a certain ditch, and thereafter, on account of increased diversion of water by defendant's and other canals further upstream and the difficulty of maintaining his former canal, changed his mode of diversion to defendant's canal, which served his land with water for ten years, and then in an action against other canals involving the right to

divert water defendant secured a decree in its favor, establishing its right to divert water for plaintiff's land, defendant is estopped from claiming that plaintiff has abandoned his appropriation through the former canal.

15. SAME—CANAL COMPANIES—PRIVATE AGENT.—A corporation, not an owner or possessor of arable or irrigable lands, diverting water from a public stream for the purpose of supplying the owners or possessors of arable or irrigable lands, and confining its service to the diversion and carriage of water, as the agent of particular appropriators of water, with whom it has fixed contractual relations binding it to perform such service, is a private agent, and cannot be compelled to render such service to others.

16. SAME—SAME—PUBLIC AGENT.—A corporation not an owner or possessor of arable or irrigable lands, if it undertakes to and does divert and carry water for the use of consumers of water, not as the agent of particular appropriators, with whom it has fixed contractual relations to furnish water, becomes a public agent, and cannot under the law discriminate by giving preference other than with due regard to priority of appropriation.

17. SAME — SAME — WATER-RIGHTS — TRANSFER—UNDER WHAT CONDITIONS ALLOWABLE—MUST BE ATTACHED TO PARTICULAR LAND.— A shareholder in an irrigation company who is also a water-right holder by virtue of his ownership of a share of stock and the ownership or possession of arable and irrigable land irrigated by means of such water-right may not assign such water-right to another to be used upon lands which the assignor does not own or possess while said assignor retains the land to which such right is attached, since a water-right, to be effective, must be attached to and pertain to a particular tract of land, and cannot be made to do duty to such land as well as to land not owned or possessed by such water-right holder at the will or option of the latter.

18. SAME — SAME — CANAL COMPANY—CORPORATIONS—PUBLIC AGENT— NON-WATER-RIGHT HOLDER—RIGHT TO SERVICE—DISCRIMINATION.— A corporation, by adopting and continuing the practice of supplying water to others than its water-right holders owning or possessing arable or irrigable land, not being itself an appropriator of water carried or the owner thereof, and dealing with public property, became a public agency to the extent that plaintiff at the time he made his application for water, although not the owner or lessee of a water-right, was entitled, upon the payment of the charge for similar service to other non-water-right holders, whether holders of orders from water-right holders or not, to have delivered upon his lands water sufficient for the irrigation thereof, in preference to other non-water-right holders whose appropriations were subsequent in time.

19. SAME—SAME—SAME — DUTY TO SERVE NON-WATER-RIGHT HOLDERS SECONDARY.—Non-water-right holders in an irrigating canal cor-

poration are not on a parity of right with water-right holders
therein, the corporation owing a first duty to supply the needs of
its water-right holders and a secondary duty to serve surplus
waters to the non-water-right holders.

APPEAL from a judgment of the District Court of the
Third Judicial District in and for the County of Maricopa.
Webster Street, Judge.    Reversed.

The facts are stated in the opinion.

W. H. Stilwell, and Joseph H. Kibbey, for Appellant.

An appropriation is a diversion of water from a natural
stream united with an application to a beneficial use.   *Wheeler*
v. *Irrigation Co.,* 10 Colo. 582, 3 Am. St. Rep. 603, 17 Pac.
487; *Farmers' High Line etc. Co.* v. *Southworth,* 13 Colo. 11,
21 Pac. 1028.

"The *right to use the water* is the *essence* of appropriation.
The means by which it is done are incidental."   *Offield* v. *Ish,*
21 Wash. 277, 57 Pac. 809.

"The appropriation of water for a specific purpose qualifies
such appropriation, by limiting the volume to the quantity
necessary for such purpose."   *Colorado Milling Co.* v. *Lari-
mer Irr. Co.,* 26 Colo. 47, 56 Pac. 185; *Ostman* v. *Dixon,* 13
Cal. 33; *McKinney* v. *Smith,* 21 Cal. 374.

"An appropriator of water from a stream already partly
appropriated acquires a right to the surplus or residuum he
appropriates; and those in whom prior rights in the same
stream are vested cannot enlarge or extend their use of water
to his prejudice."   *Proctor* v. *Jennings,* 6 Nev. 83, 3 Am.
Rep. 240; *Cache La Poudre* v. *Water Co.,* 25 Colo. 144, 71
Am. St. Rep. 123, 53 Pac. 320; *Water Co.* v. *Powell,* 34 Cal.
109, 91 Am. Dec. 685.

"*Intention is a most important factor* in determining the
validity of an appropriation of water.   This fixes the limita-
tion as to quantity of water necessary, according to acts,
diligence, and needs of the appropriator."   *Colorado M. and
E. Co.* v. *Larimer Irr. Co.,* 26 Colo. 47, 56 Pac. 185; *Power*
v. *Switzer,* 21 Mont. 523, 55 Pac. 35.

"Water appropriated to public uses becomes subject to the
public uses declared by the constitution [Cal.], without refer-
ence to the mode of its acquisition by either party, and right

to continued use does not depend upon covenants of contracts." *San Diego County* v. *Sharp,* 97 Fed. 399.

"It is not determined by the size of the ditch, but by the amount actually applied to a beneficial use. Prior appropriation governs in New Mexico Territory and water-rights must be determined by it." *Millheiser* v. *Long,* 10 N. Mex. 99, 61 Pac. 113.

C. F. Ainsworth, and L. H. Chalmers, for Appellee.

SLOAN, J.—The facts presented by the record are as follows: The Salt River Valley Canal Company is a corporation organized under the General Incorporation Act of the territory, and its articles bear date the sixth day of September, 1875. The articles recite that: "We, the undersigned, being desirous of forming a corporation for the purpose of supplying a portion of the valley lying upon the north side of the Salt River, and in the vicinity of the town of Phœnix, with water for irrigation and for milling, manufacturing, and mechanical purposes, under and in pursuance of the laws of the territory of Arizona, do hereby certify and declare as follows: First. That the said corporation shall be known by the name of the Salt River Valley Canal Company. Second. That the object of the said corporation shall be to carry on and conduct the business of supplying a portion of the valley lying upon the north side of Salt River, in the county of Maricopa and territory of Arizona, and in the vicinity of Phœnix, with waters for irrigation and for milling, manufacturing, and mechanical purposes, and to this end and for this purpose to purchase, construct, build, or dig such canals, ditches, or flumes as may be necessary to convey water from Salt River; taking it from said river at a point at or near the head of the old ditch used by the Swilling Irrigating Canal Company, and conveying said water to such point or points in the above-described valley of Salt River as may be necessary for the disposal of or use of said water. Third. The amount of capital stock of said corporation or company shall be twenty thousand dollars, which will be divided into forty shares, of the value of five hundred dollars each." It appears that prior to the organization of the Salt River Valley Canal Company a company known as the "Swilling Irrigating Com-

pany'' owned and operated what was known as the ''Swilling Canal,'' which had been constructed prior to the year 1871. It further appears that the incorporators of the defendant company were for the most part stockholders in the Swilling Irrigating Company, and that one of their purposes in organizing the defendant company was to purchase what was known as the ''South Branch,'' or ''Middle Extension,'' of the Swilling canal, the property of the Swilling Irrigating Company. After the organization of the defendant company the stockholders in the Swilling Irrigating Company whose lands were irrigated from this South Branch, or Middle Extension, of the Swilling canal, joined in a conveyance of the water-rights held by them in the Swilling canal, and of their interests in the Swilling canal, to the defendant company, and received in exchange therefor shares of stock in the defendant company to the amount of thirty-seven shares. As there were forty shares of stock in the defendant company, three shares were left undisposed of after the issuance of the thirty-seven shares in exchange for the water-rights and stock in the Swilling Irrigating Company. These three shares were subsequently sold by the company at public auction. In 1884 the capital stock of the Salt River Valley Canal Company was increased to fifty shares, and the additional ten shares sold to various persons. The shares of stock issued by the company were in the ordinary form used by corporations. These shares, however, were treated by the holders thereof and by the defendant company, as a corporation, as representing water-rights in the company's canal. Until the year 1888 each holder of a water-right was permitted to take from the canal and use as much water as his needs might require for the irrigation of the lands which he cultivated. In fact, during these years it does not appear that there was any scarcity in the amount of water available which made it necessary to put any limitation upon the amount of water which each holder of stock might use. During the year 1888, by resolution adopted by the company, each shareholder was limited to one hundred miners' inches of water, measured under two inches pressure, which he might have delivered to him through the company's canal under and by virtue of each share of stock. This amount was subsequently reduced to eighty inches per share. Prior to the year 1884 it was the

practice of the company to sell water, as it was called, to others besides stockholders; a higher price for such service being charged to such purchasers as were not the holders of stock than to the shareholders. In 1884 the company, by resolution, adopted the policy of selling water to shareholders in the company and to those renting or representing shares in the company, and this policy has ever since that date been followed. Under this resolution of the company the practice grew up of shareholders from year to year renting their shares or parts of shares to others, and these lessees were permitted to purchase from the company water during the irrigating seasons upon the same terms and in the same amounts as were permitted to shareholders. The water-rights represented by the shares of stock were treated and regarded as not appurtenant to any particular lands, but were regarded as entitling the owner or lessee to purchase water up to the maximum amount to which each was entitled, and to apply the same upon any land he chose to cultivate during the irrigating season. One who was not a stockholder, and who desired water from the canal for purposes of irrigation, would lease a share or part of a share, and obtain an order from the owner thereof, and this order was honored by the company by the sale to the lessee of water for the irrigating season at the same rate which was charged the shareholder. An attempt was made in the year 1887 to change the policy theretofore adopted, and to divide each water-right represented by a share of stock into three, which would make, in all, one hundred and fifty water-rights. The resolution of the company upon this subject stated that its purpose was to distribute these water-rights by way of dividends to the shareholders, and this was called ''creating water-rights.'' While the expressed purpose was that of ''creating water-rights'' by way of dividends, it is clear that the real purpose was that of abolishing the floating water-rights attached to shares of stock, and making them appurtenant to particular tracts of land. These water-rights in form were deeds of conveyance, and contained certain conditions limiting the amount of water which could be purchased annually by the holder thereof, and which he was entitled to have delivered to him, the manner of distribution of the water, the annual charge to be collected by the company, and other conditions establishing and fixing the

rights and privileges which each holder should enjoy. The
resolution of the company made it optional upon the share-
holders to accept these water-deeds, and, as a matter of fact,
the great majority of the shareholders declined to accept
them.

The plaintiff, Slosser, is the owner of land described in his
complaint, and this land is situated near the westerly end of
the defendant's canal. Plaintiff purchased this land from
one King Woolsey during the year 1877. At that time about
ninety acres of this land had been cultivated. Plaintiff's
grantors began the cultivation of this land in the year 1871,
and water for this purpose was obtained first from the canal
known as the "Chivari Ditch," the head of which was below
that of the Salt River Valley company's canal. In January,
1874, the head of the dam of the Chivari ditch was destroyed
by a flood, and seems never to have been rebuilt. The owners
of stock in the Chivari ditch, including plaintiff's grantors,
after the destruction of said ditch obtained water-rights in
what was known as the "Monterey Ditch." Plaintiff's land
was irrigated from the Monterey ditch until 1877, after which
date, until the year 1880, plaintiff obtained water from what
was known as the "Farmers' Ditch." As all of these ditches
headed at points on the Salt River, below the head of the Salt
River Valley canal and other canals, it became difficult to
keep the Farmers' Canal supplied with water. During the
year 1880 plaintiff obtained water from the Salt River Valley
canal, by the payment of the yearly charge therefor made by
the company; and plaintiff has continued ever since, with the
exception of one or two seasons, to irrigate his land from the
latter canal until denied this right by the defendant company.
At one time it appears that plaintiff controlled a one-half
share of stock in the Salt River Valley Canal Company, and
by means of this obtained water from the company. After
the adoption of the resolution by the defendant company
limiting its sales of water to shareholders and lessees of the
same, plaintiff complied therewith, and obtained orders from
various shareholders, and obtained his water by means
thereof. In November, 1895, plaintiff applied for water for
the ensuing irrigating season at the company's office, but was
denied the right, upon the ground that, not being the owner
of a share of stock, he had not obtained an order from any

shareholder therefor. He thereupon brought suit in the district court of Maricopa County, praying for a mandatory injunction requiring the defendant company to deliver to him the water which he had applied for upon the same terms and conditions required of shareholders and their lessees. The relief prayed for by plaintiff was granted by the trial court. In 1899 plaintiff again applied for water and tendered the amount charged by the company for such service during the irrigating season of that year, and was again refused, whereupon plaintiff brought this suit. The case was heard by the court, and judgment rendered for the defendant, denying the injunction prayed for and dismissing the complaint. From the ruling of the trial court denying plaintiff's motion for a new trial, this appeal is brought. The assignments of errors made by the appellant in his brief are based upon alleged errors in the findings of the trial court, and in the conclusions of law drawn therefrom, and upon the judgment rendered in accordance therewith.

The theory under which plaintiff claims the relief sought is that he is an appropriator of water, and as such is entitled to the service of the defendant company in the delivery of the water called for by his appropriation, upon the payment of the fixed charges of the company for such service, and that the defendant company, not being itself the owner of the water diverted by it, and being but a public agency for the carriage of water and delivery of the same to appropriators owning or possessing lands under it in the order of the priority of their appropriation, cannot refuse him such service. The theory of the defendant, on the contrary, is, that the Salt River Valley Canal Company is in no sense a public agency, and possesses the right to dispose of the water it diverts, to its shareholders or to others, as it may elect, upon such terms and conditions as it may provide; that the plaintiff, not being the owner of a share of stock or a water-right deed, is not in privity of contract with it, and therefore has no right to require its service, or to compel it to furnish him water for the irrigation of his land. It is further contended by the defendant that the plaintiff has lost by abandonment his right of prior appropriation, and is now on the footing of a landowner who is not the owner of any water-right in its canal or in the water which is diverted thereby. These conflicting

contentions involve the consideration—First, of the *status* of
the Salt River Valley Canal Company and its shareholders;
second, the *status* of the plaintiff to the defendant company
by virtue of his former appropriation of water by himself
and his grantors under the various canals from which he
obtained water for the irrigation of his lands prior to 1880,
and his subsequent dealings with defendant company since
that date.   In the consideration of the questions involved,
it will be noted that we have confined our examination largely
to the statutes of the territory, and have not attempted to
review the decisions of other courts relating to the same gen-
eral subject.   An examination of the statutes of the various
states and territories where the doctrine of prior appropria-
tion is recognized and enforced will disclose that the legisla-
tion of this territory differs fundamentally, upon the subject
of appropriations of water for beneficial uses, from the legis-
lation of other states and territories, with the single exception
of the territory of New Mexico.   Arizona prior to its organiza-
tion as a territory constituted a part of the territory of New
Mexico, but originally, and before the annexation under the
treaty of Guadalupe Hidalgo and the subsequent purchase
under the Gadsden treaty, of that part of the territory lying
south of the Gila River, constituted a part of the state of
Sonora.   The first legislation by the territory followed closely
the old Spanish and Mexican laws upon the subject of water-
rights, as these had been incorporated in the statutes of New
Mexico.   Under these Mexican and Spanish laws enforced in
the state of Sonora the holding of land was the basis for any
valid appropriation or use of water from a public stream.
The community ditch, or "public acequia," as termed in the
Howell Code, was the usual and ordinary means for the
diversion of water.   Each village or group of farmers con-
structed its own common ditch.   The management and control
of this ditch was regulated by law, and not by the agreements
or contracts of the users of water under it.   Such ditches were
recognized and treated as public property, in much the same
way that a public road under our laws is regarded.   Hence
every landowner under it, whether he used water or not, was
required to contribute his quota of labor in the maintenance
and preservation of the ditch.   The law regulated the matter
of priority of right upon the basis of land titles.   The oldest

Arizona 7—25

titles, in times of scarcity, conferred upon the owners the prior right to the use of water from the public acequia. As we will see, the principles of the Sonora law regulating the rights of users of water from a public stream diverted by means of a public acequia were adopted; and in those sections of the statute of our territory which permitted the construction of private ditches and their ownership by individuals the same principles were recognized, to the extent that the ownership or possession of arable and irrigable land was made the basis of the acquisition and enjoyment of the right of appropriation. Whatever, therefore, may be the law as declared by the supreme court or court of appeals of Colorado, or the courts of last resort of other states and territories having a dissimilar history, or whose water laws have grown out of the local customs of miners, as in California and Nevada, these are not controlling, and are not even authoritative in the decision of questions which arise, as in this instance, wholly and entirely under our own peculiar statutes. The various congressional acts pertaining to water and water-rights, beginning with the act of July 26, 1866, have recognized the local laws, customs, and decisions of courts as controlling in the matter of the acquisition, enjoyment, and disposition of rights to the use of water on the public lands, and hence do not need to be especially considered.

As we have seen, the articles of incorporation of the Salt River Valley Canal Company were drawn under the General Incorporation Act in force at the time of the incorporation. This General Incorporation Act did not recognize ditch or canal companies as possessing rights and privileges beyond that of other incorporations. The professed purpose of the incorporation was to divert and deliver water from the Salt River for use upon the lands covered by it. The corporation, as an entity, has never been the owner or possessor of any land, except such as is included within its right of way. Under the law as it existed at the time of its incorporation, did it become, and did it acquire rights as, an appropriator of water? Section 22 of the bill of rights (Rev. Stats. Ariz. 1901, par. 22), which is to be considered simply as an act of the legislature, provided that "all streams, creeks, and ponds of water capable of being used for the purpose of navi-

gation or irrigation are hereby declared to be public property, and no individual or corporation shall have the right to appropriate them exclusively to their own private use, except under such equitable regulations and restrictions as the legislature shall provide for that purpose." It may be contended that under this act a corporation was recognized as possessing the same right as an individual to appropriate water, and doubtless this is true, but the restriction provided by the legislature upon the subject of appropriations of water from a public stream apply alike to individuals and corporations. This is made clear when we examine sections 1, 3, and 7 of chapter 55 of the Compiled Laws (Rev. Stats. Ariz. 1901, pars. 4174, 4176, 4180), which were in force at the time the company was organized. Section 1 (par. 4174) reads as follows: "All rivers, creeks and streams of running water in the territory of Arizona, are hereby declared public, and applicable to the purposes of irrigation and mining as hereinafter provided." Said section 3 (par. 4176) provided "that all the inhabitants of this territory, who own or possess arable and irrigable lands, shall have the right to construct public and private acequias and obtain the necessary water for the same from any convenient river, creek or stream of running water." Section 7 (par. 4180) reads: "When any ditch or acequia shall be taken out for agricultural purposes, the person or persons so taking out such ditch or acequia shall have the exclusive right to the water or so much thereof as shall be necessary for said purposes," etc. It will be observed that in section 3 (par. 4176) acequias or ditches are divided into two classes,—public and private. Other sections of the statute clearly define and set forth the nature, rights, and privileges of public acequias. In section 3 (par. 4176) the ownership or possession of arable and irrigable lands is distinctly stated to be a condition precedent to the construction of an acequia, and the diversion of water for the same from any river, creek, or stream of running water. In said section the term "inhabitants" is used as descriptive of those who possess the right to appropriate water for agricultural purposes. In section 7 (par. 4180) the term "person or persons" is used in a like connection. The word "inhabitants" is one of great variation of meaning. Primarily it refers to one who is an established or permanent resident of a particular place. An

examination of the authorities shows, however, that it is frequently given a much broader meaning than this. In *Tripp* v. *Insurance Co.*, 12 R. I. 435, a mutual insurance company organized under the laws of the state of Rhode Island was considered an inhabitant of the place where its principal office was situated, for the purposes of taxation. In *Bank* v. *Bunnell*, 10 Wend. 186, an incorporated bank was held to be an inhabitant of the place where it did business. Other courts have held, however, that the term "inhabitant," as used in statutes, cannot be made to apply to incorporated companies. *State Bank* v. *Charleston City Council*, 3 Rich. Law, 348; *Hartford Fire Ins. Co.* v. *City of Hartford*, 3 Conn. 15. The word "person," used in section 7, has been uniformly held to include both natural and artificial persons, unless the context clearly shows that the statute was intended to imply and to be restricted to the former. The decisions upon this point are too numerous to be here cited. We think that, construing section 3 (par. 4176) and section 7 (par. 4180) together, a corporation is included among persons authorized and empowered to construct acequias and make an appropriation of water for agricultural purposes. The condition, however, upon which this may be done applies alike to individuals and corporations, in this: that both must, in order to enjoy this right, own or possess arable and irrigable lands. The record shows that the Salt River Valley Canal Company at the time of its organization did not own or possess such lands. It succeeded to the property known as the south or middle extension of the Swilling Irrigation Company. This property consisted of a dam and canal, constituting a mere conduit for water. So far as the record shows, the company has never since its organization been the owner of any such lands. If, therefore, the ownership or possession of arable and irrigable lands is essential to the acquisition of a "water-right," as it is called under the statute, then the Salt River Valley Canal Company was not at the time of its organization, nor has it even been, an appropriator of water. If not an appropriator, what, therefore, is its *status* as a carrier of water? The definitions given of an appropriation of water have not been uniform. They, however, all agree in this: that it involves the idea of the use or application of water from a public stream for a beneficial purpose, under conditions prescribed

by statute, or by custom having the effect of law, so as to vest a permanent right to such use and application. Such use and application necessarily involve, in order to constitute a permanent right, an equally fixed or permanent ownership or control of the means by which the use and application may be enjoyed. In the very nature of things, a conduit of some sort, by which water in a public stream may be diverted and conducted upon the land of the appropriator, is necessary. It has never been held that an exclusive ownership in such conduit is essential. Means of diversion may be owned in common by a number of appropriators, or such means may be owned by one person and the appropriation of water by another, provided the latter has a fixed or permanent right, by contract or otherwise, entitling him to the service of such means for the purpose of his appropriation. The great cost of constructing dams and canals, and the maintenance of these when constructed, and the advantages in the way of conservation and saving of water which result on the erection and maintenance of large and permanent dams and canals, preclude the policy of restricting the ownership and control of such dams and ditches to actual appropriators. The difficulties arising from the ownership and control of such means of diversion by one or more individuals as tenants in common are such as to make it necessary, almost, that corporations be organized for this purpose. Such corporations have been organized, and their rights to the ownership and control of their property have been recognized, in all the arid states and territories. In some instances such companies have issued what are termed "water-rights" to landowners, which give to the latter, on certain terms and conditions, a permanent right to the service by such companies through their canals of water for the irrigation of their lands. In other cases the practice has been to recognize the right of a stockholder to this service by virtue of his holding shares of stock. The land department of the government has recognized such a contract, under the Desert Land Act of 1887, which required of an applicant for desert land, in order to obtain title, that he show his right, based upon *bona fide* prior appropriation, to the use of water to the extent necessary for the irrigation and reclamation of such land, as sufficient evidence of an appropriation to entitle one to acquire the title of the government. The appro-

priator may thus, immediately, by constructing and owning his own ditch or canal, or, mediately, by acquiring the permanent right to the service of another's ditch or canal, whether the latter be owned by a natural or artificial person, perfect his appropriation. A corporation thus organized for the purpose of furnishing water for agricultural purposes, to be used by others in privity of contract with it, becomes the mere agent of the latter, and, under the statute, may divert from a public stream water which the latter may acquire and use for purposes of irrigation. The measure of its right so to do is the needs and requirements of those owners or possessors of arable and irrigable lands with whom, by contract, it stands in relation as agent. The doctrine of agency, therefore, unless we concede to such corporations a right not enjoyed by other inhabitants under the statute, must be invoked, in order to confer upon them any right to the diversion of water from a public stream. This precludes the idea that a corporation which constructs an irrigating canal for the purpose of diverting public waters acquires any rights beyond what it could acquire were it a natural person, and it must therefore connect itself by contract, unless it be the owner or possessor of arable and irrigable lands, with those who do own or possess such lands before it may take into possession and under its control water which is dedicated by the statute to the public, and which is applicable for purposes of irrigation or other beneficial uses. The warrant for the diversion of water by incorporated companies which do not own or possess arable and irrigable land must be found in the fact that they supply actual users or appropriators. Their right to divert water from a public stream depends wholly upon the use which is made of it, and is measured by the rights of its users as appropriators. Such a company, therefore, is to be regarded as a mere agency by which appropriations of water made by the owners or possessors of arable and irrigable land are made effective. Water, being public property in a running stream, continues to be public property even when diverted for beneficial uses, and remains such until actually applied to such uses. Our statutes do not recognize the right of ownership of water, as distinct from its use or application. Whenever an appropriator of water ceases to use for a beneficial purpose any water which has its source in a public stream,

his power or authority to control the same ceases. A corporation, therefore, which is not itself an appropriator, cannot, by the mere ownership of the dam or canal, and by virtue of its diversion of water from a public stream by means of the same, become the proprietor or owner of public waters. Whenever, therefore, it does not connect itself in the diversion and carriage of water with those who have the right to make a beneficial use of the same, it becomes, in a sense, a trespasser, and its diversion and carriage of such water are without authority of law. We do not mean to imply that a corporation may not lawfully divert and carry water, and supply the public generally, without regard to fixed contractual relations with the consumers. Inasmuch as it is dealing with public property the use of which is restricted to public purposes, it is nevertheless bound, in the distribution of the water it carries, to recognize the rights of its consumers as fixed by the statute. If it confines its service to the diversion and carriage of water from a public stream as the agent of particular appropriators of water, with whom it has fixed contractual relations, it owes no duty to others, whether appropriators or not. If, however, it undertakes to and does divert and carry water from a public stream, and undertakes to serve consumers of water, not as the authorized agent of particular appropriators, its *status,* not being that of an appropriator or the owner of the water it carries, must become that more nearly akin to the public acequia than the private acequia. When it ceases to become a private agency of particular appropriators, unless we recognize the right of such companies to the diversion of public water as exceeding that of a natural person, and concede to them ownership in the water diverted, it must follow that it becomes, in a sense, a public agency. Were it not for the fact that appropriators of water from a public stream do not have equal rights to the use of such water, but each appropriation, as against other appropriations, depends for its priority upon the time when it was made, the *status* of a corporation undertaking to supply consumers of water for agricultural purposes, without regard to fixed contractual relations, would become that of a public carrier. Some of the courts in the arid states have chosen to regard such corporations as, in a sense, public carriers. Inasmuch as, in the nature of things, their ability to supply the public with water must be

limited, and as the consumers, under the law of prior appropriation are not and cannot be upon the same footing as to their rights to the use of such water, the statutory term, "public acequia," more accurately describes their character and *status*. At any rate, it is clear to us that the law governing public acequias, or the conflicting rights of independent appropriators from a public stream, must control such companies in the disposition of the water they divert and convey, to the extent that they must regard the maxim that, as between consumers, *qui potior est in tempore, potior est in jure.*

Having in view these general principles, we will now consider in what manner they apply to the defendant company. As we have seen, since the organization of the Salt River Valley Canal Company, and all through its history, its shareholders have been regarded as water-right holders as well; each share of stock being treated as carrying with it, as an incident to its ownership, a water-right in the canal. As between the corporation and its members, and between the shareholders themselves, there can be no question but that such shares of stock, and the ownership of the same, may establish all the rights to the use of water which would follow were the owners of such shares tenants in common in the canal, provided each stockholder claiming such right has made an actual application of it to a beneficial use. As said by the supreme court of Colorado, in *Combs* v. *Ditch Co.*, 17 Colo. 146, 31 Am. St. Rep. 275, 28 Pac. 966, "Individuals may organize a company, either by or without incorporation, for the construction of an irrigating ditch, and may by such means divert unappropriated waters of a natural stream. They may provide that their several interests in such an enterprise shall be represented by shares of stock." And as said by Mr. Justice Hayt, of the same court, in *Strickler* v. *City of Colorado Springs*, 16 Colo. 61, 25 Am. St. Rep. 245, 26 Pac. 313: "A stockholder in an irrigating company, who makes an actual application of water from the company's ditch to beneficial use, may by means of such use acquire a prior right thereto; but his title to stock, without such use, gives him no title to the property." Had the defendant company confined its diversion and carriage of water to the extent of supplying its shareholders who are the owners or possessors of arable and irrigable land, to the extent of their needs, as the mere agent

of such appropriators, it would have remained a mere private ditch company, and would have owed no duty to others than its shareholders. As we have seen, for many years after the organization of the company it supplied others than its shareholders with water. After 1884 it restricted its service to its shareholders, and to those who obtained an order from shareholders, as the lessees of shares for particular irrigating seasons, but did not confine itself to supplying water for the irrigation of lands which its shareholders, as water-right holders, either owned or possessed. It respected the assumed rights of its shareholders to the extent of supplying those who might obtain the consent of such shareholders to use water called for by such water-rights. At the time when plaintiff made his application to the company for water, the testimony shows that the company was undertaking to supply others besides its shareholders with water for the irrigation of lands which the latter neither owned nor possessed, upon the assumption that such shareholders were entitled, under their appropriations and water-rights, to lease or assign them for particular seasons, to be used upon any lands whatsoever.

As we have seen, the statutes make the ownership and possession of lands essential to a valid appropriation of public water. A water-right, therefore, to be available and effective, must be attached to the land, and become, in a sense, appurtenant thereto. It follows, therefore, so long as such water-right is attached to a particular tract of land it cannot be made to do duty to other land. The law does not recognize that an individual appropriator of water, having a prior right to the use of the same, may, indiscriminately, by himself or others, make it apply, so as to retain its priority, to any land whatsoever. If a canal company is not an appropriator of water, and possesses no right as such, and if it may divert public water only for the purpose of supplying appropriators, and in thus doing must regard the law of priority, a shareholder of such company, as such, can possess no right which is not enjoyed by the company. It appears, too, from the testimony that some of the shareholders whose orders were respected by the company were not owners or possessors of land, and hence not appropriators, under the statute. And, if an individual appropriator of water cannot make his appropriation do duty to land to which it is not attached, his owner-

ship of a share of stock in such company cannot enlarge his right. The recognition, therefore, of these shares of stock as ''floating'' water-rights is not warranted by law; and the practice, therefore, of the company, of ''selling water,'' as it is termed, for irrigating seasons, to persons who were not water-right holders in the company, upon the orders of shareholders, was the same, in effect, as though it had supplied such users with water without the consent of such shareholders.

. The proof shows that plaintiff and his grantors have cultivated the land which he now owns from 1871 to 1880, under various canals in which plaintiff and his grantors were the owners of water-rights. Since 1880, with the exception of one or two years, whatever water plaintiff has had for the irrigation of his land has been obtained from the Salt River Valley canal. The circumstances under which plaintiff changed his use from the Farmers' canal to the Salt River Valley canal are shown to have been the difficulty of maintaining the Farmers' canal, and the scarcity of water at its head, due to the diversion by the defendant company and other companies owning canals which headed further up the river. It is contended by the defendant that the abandonment of the Farmers' canal by its water-right holders, including the plaintiff, operated as an abandonment of their appropriations of water. Whatever may be the *status* of other water-right holders in the Farmers' canal, the defendant company, as late as 1890, in the suit known as ''Wormser against the Salt River Valley Canal Company,'' tried in the court below, which case involved the rights of various canals in the Salt River Valley to divert the water from Salt River, acknowledged plaintiff's right as an appropriator of water, by setting up such right, introducing proof to the same, and obtaining an adjudication in its favor, sustaining its right to divert and carry water necessary for the irrigation of plaintiff's lands. If plaintiff had not lost his right as an appropriator of water by obtaining water from the Salt River canal from 1880 to 1890, it cannot be very well contended that under the same circumstances his right was lost to him between 1890 and 1896, when he was first denied the right of obtaining water from the defendant's canal. Forfeitures are not favored in law, and we hold, therefore, that the circumstances under which plaintiff ceased to obtain water from the Farmers' canal, and

his use of water from the defendant's canal, coupled with the acknowledgment as late as 1890 by the defendant company of his right as an appropriator, do not show such forfeiture, but, on the contrary, establish his *status* as a valid appropriator of water from the Salt River. We do not hold that the plaintiff has acquired any contractual right to the service of said company which would entitle him to compel from said company the delivery of water for the irrigation of his lands, by virtue of such contractual relation, whenever the company confines its diversion and delivery of water to its stockholders to be used by the latter upon lands owned or possessed by them. On the other hand, we hold that his rights in the premises, so far as the defendant company is concerned, rest upon the fact that the defendant was not, at the time of plaintiff's application for water, confining its service to supplying its water-right holders for the irrigation of lands which they owned or possessed. In determining, however, whether plaintiff, as against others similarly situated, so far as the company is concerned, was entitled to the service of the company, under the law of prior appropriation, and the duty of water companies which occupy the relation of public agency in the diversion and carriage of water, we must look to the date of his appropriation, and therefore his priority of right. We think the denial by the defendant of plaintiff's application, under the circumstances shown by the record, was unwarranted, and he should have been accorded this right in preference to the holders of leases from the shareholders for use upon lands not owned or possessed by said shareholders, who were subsequent appropriators.

The importance of the questions presented by the record is such that we feel called upon to define with certainty the position we have taken, and to this end to give a brief résumé of the points decided, with a statement of those which we do not decide, which grow out of a consideration of the points decided in a collateral way, although not necessary in arriving at the result reached: We hold that the ownership and possession of arable and irrigable land is essential, under the statutes, for the acquisition of the right of appropriation of water from a public stream for purposes of irrigation. We hold that a corporation not the owner or possessor of arable and irrigable land may lawfully construct a dam, canal, or

other conduit of water, and divert from such stream water for purposes of irrigation, but that in so doing it becomes in no sense an appropriator or owner of the water so diverted. Its *status* is that of either a private or public agency, depending upon whether its diversion is for the purpose of supplying owners or possessors of arable and irrigable land with whom it has fixed contractual relations, binding it to perform such service, or whether its purpose or practice be to supply owners or possessors of such land who are not its water-right holders, or with whom it has not bound itself by contract to permanently render such service. If it confined its service as the private agent of certain appropriators, it cannot be compelled to render service to others. On the other hand, if it undertakes to and does divert and carry water for the use of consumers with whom it is not bound by such contracts, and hence becomes a public agency, it cannot, under the law, discriminate by giving preference otherwise than with due regard to priority of appropriation. We further hold that a shareholder in such a company who is also a water-right holder by virtue of his ownership of such share of stock and the ownership or possession of arable and irrigable land irrigated by means of such water-right may not assign such water-right to another, to be used upon lands which the assignor does not own or possess, for any particular season, so as to confer upon the assignee his priority of right, and that such company does not possess the right to discriminate in favor of such holders, as against other appropriators of water under its canal, who were prior in right. In other words, a water-right, to be effective, must be attached to and pertain to a particular tract of land, and is in no sense a "floating" right. We do not wish to be understood as holding that a water-right which is so attached becomes inseparable from such land. That is to say, we do not hold that a prior appropriator of water may not convey his prior appropriation to another, without the land, so as to confer upon his vendee of such water-right all the rights which the vendor may possess, provided such vendee makes a beneficial use of such water-right upon lands which he owns or possesses. But we desire to be understood simply as holding that, so long as a water-right is attached to a particular piece of land, it cannot be made to do duty to such land, and as well to other land not

owned or possessed by such water-right holder, at the will or
option of the latter.   In the briefs, as well as in the very able
and elaborate argument made by counsel for appellee, the
right of shareholders to do this, and the duty of the defendant
company to recognize the right, have been strenuously argued.
In this, however, we think counsel confuses the right of an
appropriator to sell or transfer by conveyance his water-rights
to another with the assumed right in question.   To recognize
the right of a prior appropriator to lease his water-right inde-
pendent of his land would, as we conceive, be subversive of
the underlying principle of our water-right law.   The right of
alienation of a water-right is one which is based upon the
general right of property, and arises out of the necessity, in
order that injustice may not be done to the owner, of permit-
ting such alienation, for the reason that it frequently hap-
pens, through no fault of the owner, and by the operation of
natural laws, that land to which water-rights have been at-
tached becomes unsuitable for cultivation.   Floods frequently
wash away and destroy farming lands, or leave deposits of
coarse gravel and bowlders upon them; and other natural
causes frequently render such lands not only unprofitable,
but impossible of irrigation and cultivation.   Natural justice,
therefore, is subserved by recognizing the right of a water-
right holder to change his appropriation, under such circum-
stances, to lands capable of profitable cultivation, or to sell
his right to another, to be used by the latter for a beneficial
use recognized by the statute.   As the law must be certain and
general in the matter of the right of conveyances, to admit the
right of alienation under some circumstances must be the
admission of that right under any and all circumstances.
There was no principle of natural justice or of necessity that
required the recognition of the right of a water-right holder
to lease his water-right for particular seasons, while retaining
the land to which it is attached; for so long as he may use his
right in the cultivation of such land he enjoys all that the law
confers in the first instance by virtue of his appropriation.
In considering our peculiar statutes, it is well to bear in mind
the fact that the only expression in our statutes upon the
subject of priority of rights among appropriators from a
common source for agricultural purposes is found in
paragraph 3215 of the Revised Statutes (Ariz., 1887; Rev.

Stats. Ariz. 1901, par. 4191), which reads: "That during years when a scarcity of water shall exist owners of fields shall have precedence of the water for irrigation according to the dates of their respective titles or their occupation of the lands either by themselves or their grantors. The oldest titles shall have precedence always." And while this section applies primarily to public acequias, it is significant, taken in connection with paragraph 3201 (Rev. Stats. Ariz., 1887; Rev. Stats. Ariz., 1901, par. 4176), and negatives the idea that priority of appropriation is a mere personal right, which may be enjoyed otherwise than by its application upon particular lands. We hold further, therefore, that the defendant company, by adopting and continuing the practice of supplying water to others than its water-right holders owning or possessing arable and irrigable land, not being itself an appropriator of the water carried, or the owner thereof, and dealing, as it was, with public property, became a public agency to the extent that plaintiff at the time he made his application for water, although not a water-right holder of the company, was entitled upon the payment of the charge for similar service made to other non-water-right holders, whether holders of orders from water-right holders or not, to have delivered upon his lands water sufficient for the irrigation thereof, in preference to other non-water-right holders whose appropriations were subsequent in time, and that he is entitled to this service upon the same terms and conditions, so long as the defendant company continues to supply water to consumers under its canal who are not its water-right holders, whether upon the order of the latter or not, and thus continues to assume the *status* of a public agency in the diversion and carriage of water. We do not hold that the water-right holders in the Salt River canal are upon a parity of right with appellant and other non-water-right holders similarly situated to the service of the canal and to the water it diverts and carries. We assert that the canal company owes a first duty to supply the needs and requirements of the water-right holders. It is the surplus water remaining in the canal after this is done which is lawfully available to the latter class, and which must be disposed of by the company in the manner herein decided. Under the circumstances shown by the record, we hold that the appel-

lant was wrongfully denied water for the irrigation of his lands at the time he made his application, in May, 1899; it being shown that the appellee company during that season was engaged in supplying other consumers within the flow of its canal who were non-water-right holders, and thus, confessedly, was diverting and carrying water in its canal in excess of that needed and required by its water-right holders for the irrigation of lands to which their water-rights were attached, and it being further shown that appellant had the superior right to the use of such surplus water over other non-water-right holders thus supplied, by virtue of his ownership and possession of lands having an older right of appropriation. We further hold that, so long as appellant continues to be the owner or possessor of said lands, upon paying the usual and reasonable charge therefor, he is entitled to the same service, whenever and so long as the appellee company undertakes to and does divert and carry in its canal water from Salt River in excess of that needed and required by its water-right holders for the irrigation of lands owned or possessed by such water-right holders, and to which such water-rights are attached. The judgment of the trial court is reversed, and a judgment and decree will be entered in consonance with this opinion.

Doan, J., concurs.

DAVIS, J.—I do not concur in the opinion of the court in this case.